**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALBERT J. COLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-1452 |
| | ) | United States Magistrate Judge |
| CAROLYN W. COLVIN, | ) | Cynthia Reed Eddy[1] |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  Introduction

Plaintiff Albert J. Cola ("Cola" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act").  *See* 42 U.S.C §§ 401-434.  Each party has submitted cross motions for summary judgment, (ECF Nos. 8 and 15), and the record has been fully developed at the administrative proceedings.  For the reasons which follow, Cola's Motion for Summary Judgment, (ECF No. 8), will be denied, and the Commissioner's Motion for Summary Judgment, (ECF No. 15), will be granted.

### II.  Procedural History

Cola protectively filed for DIB on September 27, 2011, alleging onset of disability on September 1, 2011. (R. at 105-11).[2]  The application was denied by the state agency on January

---

[1]  By consent of the parties, (ECF Nos. 7 and 10), and pursuant to the Federal Magistrate Judges Act, 28 U.S.C. § 636(c), the undersigned has full "authority over dispositive motions . . . and entry of final judgment, all without district court review."  *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *In re Search of Scranton Hous. Auth.*, 487 F.Supp.2d 530, 535 (M.D. Pa. 2007).

27, 2012. (R. at 43-55). Cola responded on May 22, 2012, by filing a timely request for an administrative hearing. (R. at 61-63). He received notice on April 18, 2013 that the hearing would be held on August 27, 2013. (R. at 80-96). Just over a week before that hearing was to take place, Cola filed a waiver of his right to personally appear at it. (R. at 103-04). Cola explained he would be unable to appear because his anxiety disorder prevented him from driving into the city and he was unable to find anyone else who could take him. (*Id.*). However, Cola did submit a 10-page statement on August 21, 2013 detailing his condition. (R. at 164-73). On August 27, 2013, the administrative hearing was held in Pittsburgh, Pennsylvania before Administrative Law Judge ("ALJ") Leslie Perry-Dowdell. (R. at 23-27). Cola did not appear. (R. at 25). As such, the only testimony taken during the hearing was that of an impartial vocational expert, Samuel E. Edelmann ("Edelmann"). (R. at 25-27).

In her decision dated September 11, 2013, the ALJ determined that Cola was not "disabled" within the meaning of the Act since the alleged onset date of disability, so his claims for disability benefits were denied. (R. at 11-19). Three days before requesting Appeals Counsel review of the ALJ's decision on October 28, 2013, (R. at 7), Cola submitted another 10-page statement setting forth the reasons he disagreed with it, (R. at 173-83). The Appeals Counsel denied Cola's request for review on September 15, 2014, thereby making the ALJ's decision the final decision of the Commissioner in this case. (R. at 1-5). Cola had been unrepresented throughout the administrative process. (ECF No. 9, at 1).

Cola, now with counsel, commenced the present action on October 28, 2014, seeking judicial review of the Commissioner's decision. (ECF No. 3). Cola and the Commissioner filed

---

[2]       Citations to the Record, contained at ECF Nos. 6-2 – 6-8, *hereinafter*, "(R. at __)."

cross motions for summary judgment on January 14, 2015 and April 22, 2015, respectively. (ECF Nos. 8, 15). These motions are fully briefed and ripe for disposition.

## III.    Statement of Facts

### A.    Background

Cola was born on July 21, 1952, making him 61 years old at the time of the administrative hearing. (R. at 124). He graduated high school and then subsequently completed nearly enough college credits to earn an associate's degree. (R. at 201). After some early work experience in bowling alleys, in a mailroom, and bartending, Cola began working at country clubs in 1987. (R. at 202-03). Most recently, he worked as a locker room attendant at Hillcrest Country Club from April of 2001 until November of 2010, (R. at 163), when he was involved in a seasonal layoff. (R. at 106). He was subsequently "not asked back." (R. at 203).

### B.    Medical History

Cola reports that he began experiencing problems at age 12 related to Crohn's Disease and severe ulcerative colitis. (R. at 202). When he was 16, he says he "underwent subtotal colectomy as well as ileostomy and significant lysis of adhesion." (R. at 192). He was fitted with an ileostomy bag, which he has had to use ever since. (*Id.*). Still, he struggles with "chronic abdominal pain and discomfort." (R. at 202). In 1989, Cola says he started seeing a chiropractor for headaches. (R. at 160). These headaches reportedly became worse in 1997, after Cola was involved in a "head-on" automobile collision. (*Id.*). Cola says this accident also caused him to begin suffering from "anxiety, panic attacks and bouts of depression." (*Id.*).

Cola has been treating with Dr. Surinder S. Bajwa ("Dr. Bajwa") since 1994. (R. at 131). Medical evidence of record reflects seven visits taking place between May 17, 2010 and May 29, 2012. (R. at 184-91, 208-11). At the first of these visits, Dr. Bajwa noted that Cola had a past

medical history of "[s]tatus post colectomy for granulomatous colitis, mild panic disorder, hyperlipidemia, hypertension, headaches." (R. at 188). In response to Cola's assertion that he "still gets headaches off and on," Dr. Bajwa agreed to "give him Vicodin sparingly." (*Id.*). Dr. Bajwa also assessed Cola as having gastro esophageal reflux disease, after Cola mentioned that "[h]e still gets heartburn off and on." (*Id.*). Aside from Vicodin, Dr. Bajwa inventoried Cola's then-current medications to include Prevachol, Prevacid, Xanax, Atenolol, and HCTZ. (*Id.*). Dr. Bajwa also recommended that Cola have blood work completed, referring him to "the lab that does it for a reduced rate for people who do not have insurance." (*Id.*). Cola was to see Dr. Bajwa again in six months. (*Id.*).

At his next visit on November 22, 2010, Cola explained that he "still gets headaches and back pain." (R. at 187). However, he denied chest pain, shortness of breath, or cough. (*Id.*). Dr. Bajwa noted that Cola "[s]eem[ed] to be stable with [the] current regimen," and left his medications unchanged. (*Id.*). On May 16, 2011, Cola returned to Dr. Bajwa for his next six-month visit. (R. at 186). He again complained of "headaches off and on," and mentioned that he had been under stress because of being laid off. (*Id.*). Dr. Bajwa noted nothing out of the ordinary following an examination and review of Cola's labs. (*Id.*). Cola was again instructed to return in six months. (*Id.*).

This time Cola returned to Dr. Bajwa on August 16, 2011, only three months after his previous visit. (R. at 185). Cola complained of "numbness on the right side of the face and right side of the tongue," and was unable to close his right eye. (*Id.*). However, he did not have a headache. (*Id.*). Dr. Bajwa found nothing else of note upon examination, assessed Cola as having "[r]ight sided paralysis," and prescribed Prednisone. (*Id.*). Given Cola's lack of insurance, he did not want to get additional testing, and Dr. Bajwa did not think doing so was

"absolutely necessary." (*Id.*). Cola followed up on August 23, 2011, when Dr. Bajwa noted that Cola's Bell's palsy was "getting better." (R. at 184). Dr. Bajwa reduced Cola's Prednisone dose and did not issue new prescriptions for either Xanax or Vicodin, while keeping all other prior medications in place. (*Id.*).

Cola's next visit to Dr. Bajwa took place on November 25, 2011. (R. at 191). Cola was again complaining of "headaches off and on" and "[o]ccasional abdominal discomfort." (*Id.*). Upon examination, Dr. Bajwa found that Cola's blood pressure was high, at 140/100. (*Id.*). However, Cola's Bell's palsy had "markedly improved." (*Id.*). Changes to Cola's medication regimen included replacing HCTZ with Lisinopril HCTZ and renewing prescriptions for Xanax and Vicodin. (*Id.*). Cola was to "stay with atenolol 50 mg daily for the time being, given for his headaches." (*Id.*).

On November 30, 2011, Cola took part in a consultative exam conducted by Dr. Hadi Firoz ("Dr. Firoz"). (R. at 192-200). Cola reported to Dr. Firoz that he was applying for disability because of "chronic abdominal pain as well as shortness of breath." (R. at 192). Cola represented that his abdominal pain ranged in severity between a six and seven out of ten. (*Id.*). At the time of this examination, he would rate the pain as a six. (*Id.*). Cola described this pain as a "crampy, gassy type of pain throughout his abdomen without radiation," which "gets worse after eating." (*Id.*). There would occasionally be nausea associated with this pain, but no vomiting. (*Id.*).

Cola related to Dr. Firoz that he has to empty his ileostomy bag between four and five times per day. (R. at 193). He also reported that "over the past few years, [he] has been feeling more short of breath, especially with activity." (*Id.*). However, there was no associated chest pain, lightheadedness, dizziness, syncope, cough, or hemoptysis. (*Id.*). Cola also mentioned

"chronic headaches, frontal in nature for which he takes Vicodin every six hours as needed. (*Id.*). Cola relayed his belief that his headaches had gotten worse after his automobile accident. (*Id.*).

With the exception of "some tenderness along the periumbilical area," and "some tympany to percussion with no masses palpable," Dr. Firoz's examination of Cola uncovered nothing of note. (R. at 194-95). Specifically, with respect to Cola's lungs, Dr. Firoz noted "[e]qual expansion of both lungs fields. Good air movement bilaterally. No wheezes, rales, or ronchi." (R. at 195). A cardiac exam verified a "[r]egular rate and rhythm. . . . [with n]o murmurs, rubs, or gallops appreciated." (*Id.*). Finally, Cola's extremities had "[f]ull range of motion. . . . [with n]o cyanosis, clubbing, or edema," his motor strength was "5/5 in the upper and lower extremities bilaterally," he had a normal gait, and his "[f]ine and gross movements [we]re normal." (*Id.*).

Based on his examination of Cola, Dr. Firoz assessed that Cola suffered from chronic abdominal pain, hypertension, hyperlipidemia, chronic anxiety disorder, chronic headaches, and osteoarthritis. (R. at 195-96). Dr. Firoz then completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." (R. at 197-98). In it, Dr. Firoz advanced his opinion that Cola can lift 25 pounds frequently, while only occasionally lifting 50 pounds. (R. at 197). Dr. Firoz further indicated that Cola could carry 20 pounds frequently and 50 pounds occasionally. (*Id.*). While Cola could sit for eight hours in an eight-hour workday, Dr. Firoz believed he could only stand and walk for one to two hours cumulatively. (*Id.*). Beyond these, no further limitations to Cola's physical abilities were indicated by Dr. Firoz. (R. at 197-98). Each of Dr. Firoz's opinions with respect to Cola's

limitations, or lack thereof, consisted entirely of a checkmark with no further explanation or supporting evidence offered.  (R. at 197-98).

On December 7, 2011, Dr. Paul Fox ("Dr. Fox"), a non-examining state medical consultant, conducted a physical Residual Functional Capacity ("RFC") assessment based on Cola's medical history to this point.  (R. at 48-50).  Dr. Fox determined that Cola was capable of lifting and carrying 10 pounds frequently and 20 pounds occasionally.  (R. at 49).  He also determined that Cola could both sit and stand and/or walk for six hours in an eight-hour workday.  (*Id.*).  Relevant to postural limitations, Cola could occasionally climb ladders/ropes/scaffolds, kneel, and crawl, while frequently being able to climb ramps/stairs, balance, and crouch.  (*Id.*).  Dr. Fox only found environmental limitations to the extent that Cola should avoid concentrated exposure to humidity and extreme heat.  (R. at 50).

In formulating this physical RFC assessment, Dr. Fox was not persuaded by Cola's subjective assertions of limitation or the limitations of Cola's ability to stand and walk found by Dr. Firoz.  With respect to Cola's supposedly limited daily activities, Dr. Fox noted that Cola lives alone, independently performs activities of daily living, drives, and continued to work until November of 2010, when he was laid off.  (*Id.*).  Concerning Cola's report of shortness of breath with activity, Dr. Fox pointed to Cola's self-described ability to go up and down two flights of stairs, the essentially normal examination conducted by Dr. Firoz, and the fact that Cola is not on any sort of respiratory medications.  (*Id.*).  Finally, Dr. Fox believed that Dr. Firoz's finding that Cola could only stand and/or walk for one to two hours in an eight-hour workday was "not consistent with the bulk of the evidence in [the] file."  (*Id.*).

Cola then attended a consultative psychiatric examination with Dr. John Carosso ("Dr. Carosso") on January 18, 2012.  (R. at 201-08).  During his visit with Dr. Carosso, Cola reported

the following "concerns that interfere with working": "depression; anxiety; mood swings; panic attacks; obsessing on things; difficulty taking orders from bosses/supervisors; temper outbursts; poor sleep; medical/physical problems; vision problems; poor concentration; easily distracted; can't sit still." (R. at 201). In assessing Cola's mental condition, Dr. Carosso conducted a clinical interview of Cola and reviewed the medical records provided. (*Id.*). Dr. Carosso also employed the following diagnostic tools: the Mini-Mental State Exam-2, the Sheehan Work Disability Scale, and the Beck Depression Inventory. (*Id.*).

During the examination, Cola "maintained eye contact and presented as engaged with the evaluation process. His speech was normal in rate and flow and he was quite talkative and detail-oriented." (R. at 204). However, Cola's "affect was constricted and he presented as depressed." (*Id.*). Cola scored in the "severe" range on the Beck Depression Inventory. (*Id.*). He "endorsed heightened anxiety" and "bouts of irritability, but denied any significant aggression." (*Id.*). "Cola expressed himself in a coherent manner. There was no indication of thought disorder or hallucinations. Intellectual functioning was approximately average." (*Id.*). Finally, "[h]is attention and concentration was adequate during [the] evaluation, but he described difficulties in busy and demanding settings." (*Id.*). Cola "scored 29/30 on the Mini-Mental State Exam-2 with a T-Score of 55, which is above average." (*Id.*). The Sheehan Work Disability Scale showed that Cola has moderate impairment due to "lack of focus, concentration, and organizational skills," marked impairment because of "difficulty interacting with others," and extreme impairment caused by his "medical/physical ailment." (*Id.*).

At the conclusion of the examination, Dr. Carosso diagnosed Cola with "major depressive disorder, moderate to severe without psychotic features, panic disorder with agoraphobia, and generalized anxiety disorder." (R. at 205). Dr. Carosso assigned Cola a Global

Assessment of Functioning ("GAF") score of 58.  (R. at 206).  He then proceeded to opine as to functional limitations resulting from Cola's mental condition.  (R. at 207-08).  Dr. Carosso represented that Cola has marked restrictions in carrying out both short and simple instructions and detailed instructions.  (R. at 207).  Cola also has moderate restrictions concerning interacting appropriately with co-workers and responding appropriately to changes in a routine work setting.  (*Id.*).  Cola experiences marked restrictions in interacting with the public.  (*Id.*).  Finally, Cola has extreme restrictions concerning responding appropriately to changes in a routine work setting.  (*Id.*).  Each of Dr. Carosso's assertions with respect to Cola's mental restrictions consisted of a checkmark with no more than four words for a supporting explanation.  (R. at 207-08).

A mental RFC assessment was then conducted on Cola by Dr. Arlene Rattan ("Dr. Rattan") on January 26, 2012.  (R. at 50-52).  After reviewing Cola's medical records, including Dr. Carosso's report, Dr. Rattan concluded that Cola has only moderate restrictions with regard to his ability to carry out detailed instructions.  He is not significantly limited with respect to carrying out short and simple instructions.  (R. at 51).  Dr. Rattan also determined that Cola's restrictions in dealing with the general public and responding appropriately to changes in the work setting are only moderate.  (*Id.*).  "[D]espite the limitations resulting from his impairment," Dr. Rattan found that Cola "is able to meet the basic mental demands of competitive work on a sustained basis."  (*Id.*).

Dr. Rattan followed her assessment, which was no more detailed than was Dr. Carosso's, with a lengthy explanation as to why her assessment differed from his.  (R. at 52).  She explained that the more extreme restrictions found by Dr. Carosso are "not consistent with all of the medical and non-medical evidence in the claims folder."  (*Id.*).  In her opinion, it appears that Dr.

Carosso "relied heavily on the subjective report of symptoms and limitations provided by [Cola]. However, the totality of the evidence does not support [Cola's] subjective complaints." (*Id.*). As such, Dr. Carosso's opinion is "an overestimate of the severity of [Cola's] functional restrictions." (*Id.*). Further, she asserted that Dr. Carosso's report "appears to contain inconsistencies." (*Id.*). Finally, Dr. Rattan pointed to Dr. Carosso's "brief clinical encounter" with Cola, which "does not provide insight that would exist from a longitudinal treatment history." (*Id.*). All told, Dr. Rattan argued that Dr. Carosso's report lacked "substantial support from the other evidence of record, which renders it less persuasive." (*Id.*).

After the conclusion of these consultative examinations and RFC assessments, Cola returned to Dr. Bajwa on May 29, 2012. (R. at 209). At this visit, his past medical history was reported to now include osteoarthritis. (*Id.*). Cola complained of "more bloating after he eats." (*Id.*). He thought it was "somewhat worse" than it had been for the past five years. (*Id.*). Dr. Bajwa noted that Cola's abdomen was "[s]oft and tender," with "no rigidity or guarding." (*Id.*). Cola again chose not to have studies done due to his lack of insurance, although Dr. Bajwa "would have liked to have done a CT scan of [the] abdomen and pelvis with oral contrast." (*Id.*). Following the visit, Cola was to continue taking his prior medications, although his dose of Lisinopril HCTZ was increased. (*Id.*).

## IV.    Administrative Decision

On September 11, 2013, the ALJ issued a written decision, finding that Cola had not been under a disability within the meaning of the Act since his alleged onset of disability, November 1, 2009. (R. at 19). The ALJ found that Cola had not engaged in substantial gainful activity since his alleged onset of disability and concluded that Cola had the following severe impairments: gastrointestinal disorders, inflammatory bowel disease status post colectomy and

ileostomy, Crohn's disease, gastro esophageal reflux disorder (GERD), abdominal pain, shortness of breath, hypertension, major depressive disorder, panic disorder and generalized anxiety disorder. (R. at 13). She determined that Cola did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). (R. at 14-15).

The ALJ concluded that Cola has the RFC to

> perform light work as defined in 20 CFR 404.1567(b). [Cola] is able to lift 20 pounds occasionally and 10 pounds frequently. He can frequently balance, stoop, crouch and climb ramps and stairs. He can occasionally kneel, crawl and climb ladders. In addition, due to shortness of breath, [Cola] should avoid extreme heat and humidity. Finally, [Cola] is able to perform simple, routine and repetitive tasks and make judgment on simple, work-related decisions.

(R. at 15).

In formulating this RFC, the ALJ found Cola's statements concerning the intensity, persistence, and limiting effects of his symptoms "not entirely credible." (R. at 16). She supported this conclusion by pointing to evidence of record which supposedly conflicts with Cola's assertions. Specifically, she notes that Dr. Bajwa reported Cola's condition to be "stable" and that Cola denied shortness of breath when Cola was seen on November 22, 2010. (R. at 16 (citing R. at 187)). She also highlights Dr. Bajwa's physical examination of Cola on May 29, 2012, conducted in response to Cola's complaints of bloating after meals, which showed that Cola's "abdomen was soft and non-tender with no rigidity or guarding." (R. at 16 (citing R. at 209)). The ALJ argues that Dr. Bajwa's treatment records show that Cola's "symptoms were managed with medications." (R. at 16 (citing R. at 184-91, 209-11)). Finally, she asserts that Cola's daily activities, including cooking, shopping, and driving, "are not indicative of a person who is totally disabled and show that he is able to function reasonably well." (R. at 18).

The ALJ also had to reconcile certain conflicts in the medical opinion evidence of record in coming to her final conclusion. She accorded "some weight" to the opinions in Dr. Firoz's report. (R. at 16). However, regarding his finding that Cola could only stand and/or walk for one to two hours in an eight-hour workday, the ALJ noted that Dr. Firoz's "physical exam produced essentially unremarkable results," with respect to Cola's strength, range of motion, and lung and heart function. (*Id.* (citing R. at 194-97)). As such, the ALJ gave greater weight Dr. Fox's opinion that Cola could stand and/or walk for six hours in an eight-hour workday. (R. at 16 (citing R. at 49)).

Additional contradictions in medical opinion evidence existed between opinions offered by Dr. Carosso and Dr. Rattan. The ALJ resolved this conflict by assigning the opinions of Dr. Carosso "little weight." (R. at 17). Despite the fact that Dr. Carosso had the advantage of actually examining Cola, the ALJ assigned more weight to the opinions of Dr. Rattan for the following stated reasons. First, she cited the brevity of Carosso's treatment of Cola, consisting of only a single visit. (*Id.*). Second, she noted that Dr. Carosso's report seemed to rely heavily on Cola's subjective report of symptoms, which precipitated an overestimate of Cola's limitations. (*Id.*). Third, the ALJ argued that the areas of more extensive restriction noted by Dr. Carosso are undermined by his observations throughout the examination. (*Id.*). Among other "inconsistencies" in Dr. Carosso's report, the ALJ points to his assignment of a GAF score of 58 as indicative of only moderate impairment; not marked or extreme impairment as he found in certain areas. (*Id.*). However, despite the little weight the ALJ accorded Dr. Carosso's report, she explained that his objective findings are fully addressed by the RFC she formulated. (*Id.*).

Based upon testimony from Edelmann, (R. at 25-27), the ALJ determined that a hypothetical individual with Cola's RFC could perform Cola's past work as a locker room

attendant, (R. at 18). Accordingly, the ALJ found that Cola was not disabled within the meaning of the Act. (R. at 18-19).

## V.    Standard of Review

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria set forth in the Listings; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is capable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is found to be unable to resume previous employment, the burden shifts to the Commissioner at Step 5 to prove that, given claimant's mental or physical limitations, age, education, and work experience, he is able to perform substantial gainful activity in jobs in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g); *Shaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The District Court must then determine whether substantial evidence exists in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A District Court cannot conduct a *de novo* review of the Commissioner's decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-197. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's fact finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1091 (3d Cir. 1986).

## VI.    Discussion

In support of his Motion for Summary Judgment, (ECF No. 8), Cola makes several arguments that the ALJ's decision was not based on substantial evidence.  First, the ALJ erred by not considering the unscheduled breaks Cola must take to empty his ileostomy bag, the side-effects of his medications, and the pain caused by his chronic headaches.  (ECF No. 9, at 13-14, 17-19).  Second, she improperly gave greater weight to opinions of non-examining doctors than to those of doctors who examined him.  (*Id.* at 14-15).  Third, the ALJ did not offer an explanation of the weight she assigned to the treatment records of Dr. Bajwa.  (*Id.* at 16).  Fourth, it was error for the ALJ to find that Cola's daily activities weighed against a finding of disability.  (*Id.*).  Fifth and finally, in her questions to Edelmann during the administrative hearing, the ALJ did not specify that the hypothetical individual would have to perform Cola's past work as a locker room attendant as it is generally performed in the national economy.  (*Id.* at 17).

The Commissioner responds as follows.  Initially, she contends that Cola has no credibly established limitations due to his ileostomy bag, medication side-effects or headaches, which the ALJ would have had to consider.  (ECF No. 15, at 14-17).  Next, substantial evidence supported the ALJ's decision to credit certain aspects of non-examining doctors' opinions versus those of contradictory examining doctors.  (*Id.* at 17-19).  Finally, the Commissioner argues that ALJs are actually required to consider a claimant's daily activities when determining credibility.  (*Id.* at 19-20).  Each of these arguments will now be considered in turn.

### A.    The ALJ Addressed all of Cola's Credibly Established Limitations with the RFC

Cola's first series of arguments focus on certain alleged limitations that the ALJ failed to address in formulating Cola's RFC.  Specifically, Cola asserts that the ALJ did not expressly

consider the four to five times a day Cola must take an unscheduled break to empty his ileostomy bag, the light-headedness he endures as a side-effect of his medication, and the pain he suffers as a result of chronic headaches. (ECF No. 9, at 13-14, 17-19). These arguments lack merit.

When making an RFC determination, "'the ALJ must consider all evidence before him.'" *Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)). As Cola suggests, "all evidence" would necessarily encompass "'the combined effect of all of the claimant's impairments without regard to whether such impairment, if considered separately, would be of sufficient severity.'" *Garrett*, 274 F. App'x at 163 (quoting 20 C.F.R. § 404.1523); *see also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). However, "the ALJ need only include in the RFC those limitations which he finds to be credible." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (citing *Burnett*, 220 F.3d at 121). Here, Cola did not credibly establish functional limitations resulting from his ileostomy bag, medication side-effects, or headaches, such that the ALJ had to address them with the RFC.

Cola failed to allege, let alone credibly establish, functional limitations secondary to his ileostomy bag or medication side-effects. With respect to the ileostomy bag, there is nothing in the record which would suggest that the four to five times per day that Cola has to empty the bag would interfere with his ability to work in any way. Notably, Cola has been using the bag since 1968, (R. at 145), and there is no mention of any resultant impediments during his ten most recent years of past relevant work as a locker room attendant. Concerning the light-headedness Cola says is caused by his medication, the record is contradictory. Cola only mentions light-headedness in conjunction with his medications once throughout the record; a single-word response in the Disability Report he submitted in conjunction with his request for Appeals

Counsel review. (R. at 155). However, in the Function Report he submitted on October 5, 2011, he expressly indicated that his medication does not cause any side effects. (R. at 146). Further, in his consultative exam with Dr. Firoz on November 30, 2011, Cola reported that he had "[n]o lightheadedness, dizziness, syncope." (R. at 193). Finally, there is no suggestion whatsoever that this alleged lightheadedness would interfere with his ability to work. As Cola did not advance either of these conditions as impairments, the ALJ did nor err by failing to discuss them when formulating the RFC. *See* 20 C.F.R. § 404.1545(a)(1) (In determining a claimant's RFC, "[w]e will consider all of [his] medically determinable impairments *of which we are aware*.") (emphasis added).

The argument that the ALJ erred by not addressing Cola's headaches in formulating his RFC is equally unavailing. Cola points to numerous references to his headaches throughout the record, and then contends that the ALJ improperly discounted his subjective complaints of pain by excluding the headaches from accommodation by the RFC. (ECF No. 9, at 18-19). This "argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act." *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004). Here, as the ALJ pointed out in her opinion, there is sufficient evidence to support Cola's allegation that he has headaches, but "[t]he record reveals no limitations secondary to" them or the resulting pain. (R. at 13). As such, there was no relevant functional limitation to be accommodated by the RFC. The ALJ's decision not to address Cola's headaches with the RFC was therefore based on substantial evidence.

**B.    The ALJ was not Required to Credit the Opinions of Examining Medical Sources**

Cola next asserts that the ALJ's decision to assign greater weight to the opinions of non-examining sources than to those of examining sources was improper.  Cola first takes issue with the ALJ's determination that he could perform "light work"[3] in spite of the opinion of Dr. Firoz that he was only capable of standing and walking for one to two hours in an eight-hour workday. (ECF No. 9, at 14).  Second, Cola challenges the ALJ's assignment of "little weight" to the opinion of Dr. Carosso, an examining medical source.  (*Id.* at 15).

"Although the ALJ may weigh the credibility of the evidence, [s]he must give some indication of the evidence that [s]he rejects and h[er] reason(s) for discounting that evidence." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).  Under 20 C.F.R. § 404.1527(c), "the factors in determining the weight of a medical opinion rendered by a non-treating source are the (1) nature of the examining relationship, (2) the nature of the treating relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and (5) the specialization of the physician offering the opinion." *Irelan v. Barnhart*, 82 F. App'x 66, 71 (3d Cir. 2003).  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Cola argues that the opinions of non-examining physicians must be subordinated to those of examining physicians, citing to *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000), for support.  (ECF No. 9, at 15).  This reading of *Morales* is incorrect.  In *Morales*, the United States Court of Appeals for the Third Circuit held that an ALJ's decision to reject the opinion of a

---

[3] Among other things, "light work generally requires the ability to stand and carry weight for approximately six hours of an eight hour day." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 119 (3d Cir. 1995) (citing Social Security Ruling 83-10 (S.S.A. 1983)).

*treating* physician, based only on his own credibility determinations, was improper. *Morales*, 225 F.3d at 318. This is because a treating source's opinion is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(c)(2). However, *Morales* is inapposite to the instant facts for several reasons, but most importantly because neither Dr. Firoz nor Dr. Carosso ever treated Cola.

Medical opinions from non-treating sources, which are not entitled to controlling weight, are always evaluated according to the factors discussed in § 404.1527(c). *Irelan*, 82 F. App'x at 71. In conducting this evaluation, the opinion of an examining source is *generally* given more weight than that of a non-examining one. 20 C.F.R. § 404.1527(c)(1). However, a decision to give a non-examining source greater weight may be properly based on the remaining factors, so long as the analysis is adequately explained. *See Fargnoli*, 247 F.3d at 43. Given these guideposts, neither of the ALJ's decisions to subordinate opinions of examining sources was improper.

With respect to Dr. Firoz's opinion, the ALJ explained that the necessity to limit Cola to only one to two hours standing and walking per eight-hour workday was unsupported by the record and inconsistent with Dr. Firoz's own examination. (R. at 16). As the ALJ pointed out, Dr. Firoz's "physical examination [of Cola] produced essentially unremarkable results," including motor strength of 5/5, full range of motion in the extremities, normal heart and lung function, and a normal gait. (*Id.*). Further, nothing in Cola's medical records reviewed by Dr. Firoz indicated "limitations that would prevent [Cola] from performing light exertional work." (*Id.*). Finally, Dr. Firoz failed to offer any supportive explanation in the blank spaces following the checkmark which represented his assertion that Cola's ability to stand and walk is limited.

(R. at 197).  Given this lack of supportability noted by the ALJ, her decision to credit non-examining physician Dr. Fox's contradictory opinion that Cola could stand and walk for six hours in an eight-hour workday was not improper.

Concerning her decision to assign Dr. Carosso's opinions "little weight," the ALJ explained that his report "relied heavily on the subjective report of symptoms and limitations provided by" Cola, and contained "some inconsistencies."  (R. at 17).  Specifically, the ALJ noted Dr. Carosso's findings that Cola had "marked limitation in [his] ability to carry out short, simple instructions, marked limitation in his ability to interact appropriately with the public and extreme limitation in his ability to respond appropriately to work pressures in a usual work setting," despite Dr. Carosso's own observations that Cola's "attention and concentration were adequate and there was no indication of a thought disorder."  (*Id.*).  Further, the ALJ also noted the GAF score of 58 assigned by Dr. Carosso, "denoting only a moderate impairment in social or occupational functioning."  (*Id.*).  This discussion adequately explains the ALJ's analysis concerning the lack of supportability of Dr. Carosso's report and its inconsistency internally and with the record as a whole.  As such, her decision to assign the contradictory opinions of non-examining physician Dr. Rattan greater weight was not improper.

### C.     The ALJ's Handling of Dr. Bajwa's Treatment Records was not Improper

Cola's third argument is that the "ALJ erred by making speculative inferences from Dr. Bajwa's treatment of the Plaintiff by finding that the Plaintiff's condition is stable from a physical and mental standpoint."  (ECF No. 9, at 16).  Specifically, Cola takes issue with the ALJ's finding that his "symptoms are managed with medications."  (*Id.*).  Although Cola's argument here is less than clear, he is apparently attempting to assert one or both of the following.  First, because the ALJ formed conclusions based on the treatment records of Dr. Bajwa, some discussion of the weight she assigned to Dr. Bajwa's opinions was necessary.

Second, ALJs may not make inferences based on medical treatment records. Each of these arguments is unfounded.

To the extent Cola argues that additional explanation of the ALJ's evaluation of Dr. Bajwa's treatment notes was necessary, none was required under these facts. It is true that an ALJ must "consider, discuss and weigh relevant medical evidence," *Fargnoli*, 247 F.3d at 42, and must provide "some explanation . . . when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record," *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). Here, the ALJ's discussion of Dr. Bajwa's treatment records is a summary, but still manages to reference six of Cola's seven total visits to him. (R. at 16). Importantly, these records detail little more than the "facts" of each of Cola's visits, including his subjective reports of symptoms, Dr. Bajwa's observations, and the drugs prescribed. Dr. Bajwa offered no opinion as to the severity of Cola's conditions or any limitations which might result from them. Even accepting that Dr. Bajwa's assessments of Cola's condition are opinions, they are completely consistent with those of the other medical sources of record. There is no indication that the ALJ rejected any of this information. Furthermore, there were no conflicts between Dr. Bajwa's treatment records and the other medical evidence which would have required reconciliation. As such, no analysis or explanation of the handling of these treatment records was necessary beyond that offered by the ALJ.

If Cola intended to argue that the ALJ made improper inferences based on Dr. Bajwa's treatment records, that argument likewise lacks merit. Of course, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports." *Morales*, 225 F.3d at 317. Here, the ALJ actually made no "inferences" to speak of. Her discussion of Dr. Bajwa's treatment records was nothing more than a factual description of

their contents.  (*See* R. at 16).  Even assuming that certain statements could be construed as inferences, they were each perfectly consistent with Dr. Bajwa's assessments, and thus permissible.  As the ALJ neither made speculative inferences nor rejected Dr. Bajwa's assessments, there was nothing improper about her review and consideration of Dr. Bajwa's treatment records.

### D.  The ALJ Properly Considered Cola's Daily Activities

Cola contends next that the ALJ improperly considered his daily activities in determining disability.  (ECF No. 9, at 16).  For the proposition that "[a]ctivities such as housework, social activities and travel cannot be used to show ability to engage in substantial gainful activity," Cola cites to *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981).  (ECF No. 9, at 16).  This is a misstatement of the law.  In *Smith*, the United States Court of Appeals for the Third Circuit held that evidence of "sporadic and transitory" activities by a claimant cannot stand alone in support of a finding that the claimant is not disabled.  *Smith*, 637 F.2d at 97.  However, despite Cola's assertion, it is entirely appropriate to consider a claimant's activities in conjunction with medical evidence that corroborates the claimant's non-disability.  *See id.*; *Garrett*, 274 F. App'x at 164 (affirming a determination of non-disability, based in part on the claimant's ability to "perform household chores and activities of daily living . . . [when] the record evidence corroborated these findings that her impairments were not as debilitating as claimed"); 20 C.F.R. § 404.1529(a) (listing "daily activities" among the "other evidence" to be considered in determining whether a claimant is disabled).

Here, Cola's daily activities were considered as only part of the evidence which the ALJ found to support a finding of non-disability.  As the ALJ noted, these activities "*also* argue against disability."  (R. at 18) (emphasis added).  Specifically, the ALJ found that Cola's ability

to live independently, which requires him to cook, shop, and drive, "is not indicative of a person who is totally disabled." (*Id.*). Given the extensive medical evidence cited by the ALJ to corroborate this conclusion, her consideration of Cola's activities was not improper.

**E.     The ALJ's Finding that Cola Could Perform his Past Work was Supported by Substantial Evidence**

In his final argument, Cola contends that the ALJ erred in finding that he could "perform his past relevant work as actually and generally performed." (ECF No. 9, at 16-17). Specifically, Cola points to the ALJ's hypothetical questions through which she only asked Edelmann whether an individual with specified limitations could "perform the claimant's past work." (*Id.*). Cola's apparent position is that Edelmann's affirmative answers to these questions are not substantial evidence to support the ALJ's finding that such an individual could perform the locker room attendant position as it is "generally performed." [4]   This argument is unpersuasive. To begin with, it seems clear that Edelmann was referring to the locker room attendant position as it is generally performed in the national economy, given his description of it as "an SVP: 2, unskilled and light." (R. at 26). However, even accepting that Edelmann's testimony was somewhat ambiguous in this regard, his understanding of this aspect of the ALJ's hypothetical questions would have no impact on the ultimate determination of non-disability.

Regardless of Edelmann's understanding of the ALJ's questions, his answers that the hypothetical individuals could perform Cola's past relevant work are substantial evidence for the ALJ's non-disability finding. When conducting the disability analysis, an ALJ who finds that a

---

[4] Cola also argues that the ALJ's finding that Cola could perform his past relevant work is not supported by substantial evidence because she failed to indicate that the Dictionary of Occupational Titles was relied upon in coming to this conclusion. (ECF No. 9, at 17). No authority is cited to support such a requirement. To the contrary, 20 C.F.R. § 404.1560(b)(2) clearly states that ALJ's "*may* use . . . resources, such as the 'Dictionary of Occupational Titles.'" § 404.1560(b)(2) (emphasis added). As such, Cola's argument will be considered no further.

claimant can perform his "past relevant work, *either* as the claimant actually performed it or as generally performed in the national economy," must find that the claimant is not disabled. 20 C.F.R. § 404.1560(b)(2) (emphasis added). As such, allowing that Edelmann could have answered the ALJ's hypothetical questions based on Cola's past work as he actually performed it and not as it is generally performed in the national economy, those answers were still a sufficient basis to determine that Cola was not disabled.

**VII.    Conclusion**

Based on the foregoing, Cola's Motion for Summary Judgment, (ECF No. 8), will be denied and the Commissioner's Motion for Summary Judgment, (ECF No. 15), will be granted. An appropriate Order follows.


<u>May 7, 2015</u>.



By the Court:

<u>s/ Cynthia Reed Eddy</u>
Cynthia Reed Eddy
United States Magistrate Judge

cc: all registered counsel via CM-ECF

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ALBERT J. COLA,          )
                                    )
          Plaintiff,       )
                                    )
          v.               )      Civil Action No. 14-1452
                                    )      United States Magistrate Judge
CAROLYN W. COLVIN,     )      Cynthia Reed Eddy
Commissioner of Social Security,  )
                                    )
          Defendant.     )

## ORDER

**AND NOW,** this 7th day of May, 2015, after the Plaintiff, Robert Decker, filed an action in the above-captioned case, and after Motions for Summary Judgment (ECF Nos. 8 and 15) were filed by the parties,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment filed by Plaintiff (ECF No. 8) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 15) is **GRANTED**, and the decision of the Commissioner of Social Security is **AFFIRMED** pursuant to the fourth sentence of 42 U.S.C. § 405(g).

                                                                   By the Court:

                                                                    s/ Cynthia Reed Eddy
                                                                    Cynthia Reed Eddy
                                                                    United States Magistrate Judge

cc: all registered counsel via CM-ECF